# Exhibit 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:26-mj-00618-BAT |
| Plaintiff, | |
| vs. | 700 Stewart Street<br>Seattle, WA 98101 |
| JAMES CODY BRYANT, | |
| Defendant. | October 13, 2026<br>1:30 p.m. |

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE MARY ALICE THEILER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: TODD GREENBERG, ESQ.
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street
Seattle, WA 98101

For the Defendant: GREGORY MURPHY, ESQ.
Federal Public Defender
1601 Fifth Avenue
Seattle, WA 98101

Audio Operator: Electronically Recorded N/A

Transcription Company: Price Transcript Service
6 Trout Brook Road
Stanhope, NJ 07874
(973) 914-3080
www.pricetranscriptservice.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

INDEX
10/13/2026

| ARGUMENT | Page |
|---|---|
| By Mr. Greenberg | 3 |
| By Mr. Murphy | 10 |
| COURT DECISION | 20 |

(Proceedings commence.)

THE CLERK: All rise. The United States District Court for the Western District of Washington is in session, the Honorable Mary Alice Theiler presiding.

THE COURT: Good afternoon. Please be seated. And this is Case Number MJ26-618, United States vs. Ms. James Cody Bryant. Appearances, please, starting with the United States.

MR. GREENBERG: Your Honor, Todd Greenberg for the United States.

THE COURT: For the defendant.

MR. MURPHY: Good afternoon. Greg Murphy with the Federal Defender's Office for Ms. Bryant who is before the Court.

THE COURT: And good afternoon. So this is set for a detention hearing. I just wanted to mention that there were several individuals unable to attend in person who've been allowed to listen in by phone link.

And I've reviewed the first report from Pretrial Services as well as the supplemental report. Both parties submitted a memorandum, and of course, I've reviewed those. And so I'm prepared to hear argument on the question of whether Ms. Bryant should be detained pending further court hearings or released on conditions of supervision. Mr. Greenberg?

MR. GREENBERG: Thank you, Your Honor.

As this Court knows, the Government is asking the

Court to enter a detention order in this case. We start off with a presumption for detention. That's due to the specific offense that is charged in this case. That is one of a few offenses listed in the Bail Reform Act as starting out with a presumption for detention.

Beyond that, all four of the statutory factors in the Bail Reform Act weigh in favor of detention in this case. At a minimum, when looking at those four factors, the defendant cannot overcome the presumption in this case. And let me go through those factors one by one with the Court.

The first, of course, is the nature and circumstances of the offense, and it really doesn't get much more serious, much more dangerous for the community than the offense charged in this case.

The defendant was, over the course of months, in daily communication with someone who was planning a mass murder event in British Columbia. Bryant had a full understanding of what the scope of this event was going to be; discussion of how many people, how high the death toll could get. There's no question what this was about, and Bryant joined as a conspirator and aided in that plot.

We know that this culminated on February 10th at the Tumbler Ridge Secondary School when the co-conspirator, Van Rootselaar, carried out the murders at that school, killing five teenage students, one staff member, and just prior to

that, killing two of Van Rootselaar's own family members.

It's a horrific tragedy. I know we all in this courtroom agree on that. What we're here to talk about, and what the nature and circumstances of this offense call for us to focus on, is Bryant's role in that tragedy, and there are several ways that the defendant conspired to commit these murders. I want to highlight three of those briefly with the Court.

The first is Bryant's agreement to record and broadcast the live stream that was planned of the murders, broadcast that over the internet for the public to see. And make no mistake about this, the live stream was an essential component to this conspiracy. Van Rootselaar, in their own words, repeatedly stated this. Things like, "if you don't post it, it won't work." "I need people to see it and personally witness the lives be impact" -- "impacted." Van Rootselaar also said, "If I don't have someone I know for certain is going to be there, I don't want to do it."

Knowing all of that, Bryant promised to be there to accept the live stream and then broadcast it. Bryant said they would be available any time, day or night, gave the phone number, said the sleep schedule would be adjusted. Bryant helped test the live stream ahead of time on multiple occasions, making sure the feed was okay, making sure the viewing angle of the killings would be good.

And in the end, Bryant followed through with this promise. Bryant was there the moments before the murders to accept the live stream and did so. Due to a technical glitch, the live stream went down, but not due to Bryant.

Secondly, Bryant provided monetary support for this attack, sent money to Van Rootselaar for various items used in the attack but the one I want to focus on is the lighter. The Court has seen in the complaint, Van Rootselaar sent Bryant a photograph of a bomb, a bomb that was to be ignited during this attack and that was going to be ignited with a lighter. And although it's a small item and doesn't cost a lot of money, Van Rootselaar didn't have the money for the lighter. So Van Rootselaar asked Bryant to send the money, and immediately Bryant did.

Knowing what that lighter was going to be used to do, Bryant sent the money. PayPal reversed the transaction. The conspirators would have had no idea that that was going to happen. They didn't know Van Rootselaar's account had been closed down. Bryant sent the money, and that device was used in that school.

Bryant also gave advice to Van Rootselaar from time to time, tactical advice, things like what type of firearm to use, what type of building layout is most conducive to the highest death count. And of course, in the final moment when Van Rootselaar was about to drive to the school, Van Rootselaar

didn't know how to drive, didn't know how to start the car, and it was Bryant talking Van Rootselaar giving the instructions on how to start the car, and moments later, the school was attacked.

So that's the type of offense we're here talking about. The second factor is the least weighted factor, and that is the strength of the evidence in the case. Here, it's extremely strong evidence. We have all these Discord communications that are quoted throughout the complaint. We have Bryant's statements confirming most of that same information. There's really little, if any, factual disputes as to what occurred in this case.

Next is the history and characteristics of the defendant. And here there are aspects in favor of either argument that the Court will hear today. In Bryant's favor, we acknowledge Bryant has ties to the Western District of Washington. Bryant has no criminal history and at least was employed; unclear if that job is still available. Bryant's own statements to Pretrial Services cast doubt on that, but had been employed.

On the other side of the equation are the mental health issues, and I would say this issue is combined with a potential lack of candor with the Court as to this issue because when asked about having suicidal ideations, Bryant denied that to the Pretrial Service office, and that doesn't

seem to be fully truthful.

In August -- and we put a couple of these quotes in our memo to the Court. In August of 2025, Bryant told Van Rootselaar that, "I've just constantly been at the point where if just the right thing goes wrong, I'll kill myself for years. It's so exhausting." And then in January, January 12th of this year, made a similar statement. So it's not true to tell Pretrial Services that there are not suicidal ideations going on.

But most importantly, when it comes to this analysis of the history and characteristics, is Bryant's own character. And when we talk about this Bail Reform Act factor, we usually talk about other things. We talk about ties to the community, mental health, substance abuse, employment but actually, the very first thing listed in that provision in Section 3142(g)(3) is, "The person's character."

The offense in this case reveals aspects of Bryant's character that raise serious concerns about being able to ensure the safety of the community if Bryant were released. This is someone who helped plan a mass murder over the course of months, someone who sent money to build a bomb that would be used to murder people, and most importantly, someone who could have put a stop to all of this before it happened, but that is not what Bryant chose to do. Bryant chose not to intercede, to move forward with the conspiracy.

In Bryant's own words, "I know I can save lives, but I don't know, I'd rather you not get snitched on. I might be the only one who can stop you at this point. I still won't snitch."

Anyone who has that type of character, who could help plan a mass murder, sit back and let it happen and try to watch it, should be detained for the safety of the community.

The last factor is the danger to the community if the defendant is released, and again, this weighs in favor of detention. The concern here is that Bryant's participation, for the most part, in this conspiracy was through online communications. That is obviously a big concern moving forward if Bryant were to be released.

To address that, the Pretrial Services office is now recommending in their second report computer monitoring and I guess limiting access to devices. That sounds okay, but in practice it cannot be enforced in this case to any degree. Their own report indicates, according to I guess Bryant's roommates, there are at least five computers in this apartment. Three desktops, two laptops. There's a smart TV. There are four online gaming devices, and then, "several 3DSs," which I believe to be handheld gaming devices.

So that's upwards of ten-plus devices that access the internet. The monitoring is only going to be done on one computer. It's the one computer that supposedly Bryant has

access to but all these other devices are sitting right there in the apartment. There's no way to monitor Bryant's online behavior in this situation. And it's simply -- given the offense conduct in this case, it's simply too big of a risk to take with the safety of the community. We would ask the Court for a detention order.

THE COURT: Thank you, Mr. Greenberg. Mr. Murphy?

MR. MURPHY: Thank you, Your Honor.

As the Court knows, both parties submitted memoranda here. The Government's presentation tracked its memoranda very closely, and so many of the things that I will address have also been addressed in ours.

I'll begin, I guess, where the Government did, by acknowledging that, you know, words fail when we talk about the horror of what Van Rootselaar did here. I couldn't find -- I couldn't -- I couldn't find words to describe it from horrifying or tragic or just very, very sad, incomprehensible.

Those words fail. And Ms. Bryant, I think, feels that also. The Government knows but hasn't disclosed, of course, that Ms. Bryant sobbed when the FBI interviewed her two days after the murder. She sobbed when they talked -- when they interviewed her in March. She sobbed during every meeting with counsel.

Nobody can hold in our minds the reality that Van Rootselaar murdered her family and then turned her gun on

children but it is -- it is, I think, factually inaccurate from just the face of the complaint that Ms. Bryant wanted that to happen. And certainly she is, as we all are, horrified by that offense.

And I think more to the point, you know, the Government has sort of tried to couch its detention argument as a -- and to focus on Ms. Bryant's role and then later on Ms. Bryant's character. But I agree with what the Government said at the beginning, which is that this is not about sort of the horror of the offense, but prospectively whether the gover -- whether the Court can release Ms. Bryant on conditions that would reasonably secure the -- I'm sorry, reasonably protect the public.

And so while the Government has gone and made an extremely compelling sentencing argument, all the more compelling because, of course, it's the only person -- only body that has any access to the evidence in this case, that the sentencing argument is different than the question before the Court.

The Court is not here to determine whether Ms. Bryant is a, you know, terrible person or had a significant role or even whether or not she's innocent or guilty. This is only about whether, as Pretrial Services concluded, she can be released into the community under conditions that would reasonably secure or reasonably protect the public.

And for that reason, I think it's telling the way that the Government framed its arguments here, albeit not in its papers. The Government doesn't claim that it can produce clear and convincing evidence that she would be a danger if returned to the community. The Government said that we can't overcome our burden to show that she's a danger, to overcome the presumption in favor of detention that attaches because of the nature of the crime.

And that, that is just not true a question of law. We have a duty, we have a burden, it's true but that burden is just one of production. If we produce any evidence supporting any of the 3142(g) factors, then the burden of persuasion to prove danger by clear and convincing evidence is on the Government. And I think the Pretrial Services report makes clear that there are a number of factors that support the 3142(g) factors. And so as a result, by communicating with them through their memoranda, we certainly by showing, for example, a lack of criminal history, a lack of you know, employment, of community ties, the -- we've met our burden to overcome the presumption.

The -- it is also true that the -- I think the Government, as the Government says, that the evidence in here that -- that the Government relies upon for detention is the same evidence that it had on March 3rd of 2026 when it elected -- when it interviewed Ms. Bryant. There's no evidence that

suggests any new risk of danger to the community in the last seven months since they first interviewed her. And yet, I think it's telling that the Government made no effort to arrest her, left her in the community with access to the commu -- to the internet for a full seven months after that.

Having concluded, one can only assume that Ms. Bryant did not pose a danger to the community during that time. And then when it eventually decided to obtain a -- to arrest Ms. Bryant and bring these charges, the Government went and got a complaint, got an arrest warrant. They got that on October 2nd. But rather than arrest Ms. Bryant, they scheduled a press conference with people from other country -- you know, from Canada to come here. They made arrangements, made an appointment with her and then four days later, arrested her, brought her to court for initial appearance, and held the press conference.

And I say that not because I have -- I'm in any way indignant about them bringing these charges. I have no way of assessing the merits of the case. But I think it's certainly -- the Court certainly can consider whether the Government is sincere that she poses an imminent danger after they've left her in the community for seven months without any -- with -- you know, without any restrictions on her internet access or -- and then waited four additional days to arrest her.

I-- the Government says that there are no disputed

facts. I have no way of knowing whether that's true. The Government has not produced evidence in this case yet, as -- and they wouldn't typically. I'm not trying to fault them for it. But it would be incorrect to assu -- you know, to assume that we're going to agree with their characterization of everything here. But again, this Court is not here to decide, you know, that.

And I also think it's significant that the govern -- that the evidence hasn't been shared with the public. Again, that's entirely appropriate. But when the Court reads the statements that were provided, for example, from the victims that describe, you know, their fear that Ms. Bryant was grooming their friend or their relative or something to commit these crimes, we'd note that there is actually no evidence in the complaint, no -- to support those. Whoever -- we hope ultimately that whoever is communicating with the victims is honest about what the -- complete forthcoming about what the evidence shows but the evidence here is that Van Rootselaar planned this offense that -- and even under the worst possible interpretation, that Ms. Bryant was more of a cheerleader than a planner.

There are some facts that I think are undisputed. One has to do with how Van Rootselaar and Ms. Bryant met. And this is important because it goes to the -- whether or not conditions exist. It would be one thing if Van -- if Ms.

Bryant was somehow part of a community of people that believed in violence or were planning violence or met in some sort of chat room but that's just not how it happened. Ms. Bryant and Ms. Rootselaar became friends three years ago. The -- Ms. Rootselaar had very serious mental health issues. She was in and out of the hospital. She had fantasies of violence that she was spreading wildly -- widely, excuse me, to the -- you know, you know, talking about it with ChatGPT, talking about it with other people on the internet.

The Court recalls during the -- in the complaint where Ms. Bryant said that -- allegedly said that she said, oh, I may be the only person who could stop you. And Ms. Rootselaar's response was, oh no, there are other people that I'm talking to about this.

So when we talk about the potential danger that Ms. Bryant faces, you know, if she were released, if she was on the internet, there is no evidence that Ms. Bryant has ever communicated with anybody else or has access to anybody else or wants anybody else to commit any other sort of crime. She's not some sort of, you know, political radical. She's a person who became friends with somebody who was deeply, deeply disturbed.

There is no evidence in the complaint at least, which is, you know, all -- the only information any of us have, that Ms. Bryant did any sort of like grooming. The evidence is that

-- or even that she knew the specifics of Van Rootselaar's plan. The Government has said -- has pointed out that she said on a live stream and then said -- and suggested that she must have known what Van Rootselaar, where Ms. -- what Van Rootselaar had planned, what she was doing but that's -- but a careful reading of the complaint will show that that's just not true.

In fact, when Van Rootselaar talked about committing a school shooting, the complaint makes clear that Ms. Bryant discouraged her, said, if you do that, I would snitch on you. Right? If you tell me you're going to shoot up a school, that's what's -- that's what the complaint says. She says that the. And -- and it -- it's -- there's no evidence, at least on the complaint, which is, you know, and I may be -- I may be proven wrong at some point down the road, but as far as we can tell from the evidence the Government has proffered, there's no evidence that Ms. Bryant knew the specifics of Van Rootselaar's plan on that day, knew that she was going to commit carried out that day anything like that.

There's no evidence -- I think everybody agrees that Ms. Bryant has no criminal history. She's never -- she's never committed any act of violence. Nobody has ever suggested she -- she's ever behaved in any way that is violent or inappropriate. She's never failed to comply with any sort of Court order. She's always -- to the contrary, when law

enforcement approached her, she made herself available repeatedly, cooperated repeatedly. She met three times voluntarily with law enforcement. Given the absence of any criminal history and her cooperation to date, there is certainly no reason to think that she wouldn't comply with the orders set by the Court.

The Government has appropriately reviewed Ms. Bryant's communications extensively. There's no evidence that she has any contact with anybody else who's -- has any sort of violent tendencies, no suggestion that she's encouraging anybody else, or would, or knows anybody.

The Government has -- the -- the worst the Government can say is that fourteen months ago she said, you know, for years I've been on the verge of killing myself because it just feels like too much. And they've sort of tried to characterize that as a lack of candor but I think anybody who has who has worked in this system who has had any sort of exposure to psychology or therapy or anything like that, knows that there's a gulf between saying, you know, this feels like too much, I want to kill myself, and actually feeling suicidal.

We talk about people making plans. We talk about -- I mean, if you went to the FDC -- well, so making an offhand -- one offhand comment from fourteen months ago that says -- that suggested that she had been feeling the same way for years is not I think, evidence of dishonesty, and certainly no -- not

evidence that Ms. Bryant would hurt herself if released.

It is undisputed, I think, that Ms. Bryant has very close ties to the community. She had community that joined her at her last court date, her initial appearance. She has community that has joined, that is in -- in the court today. This is a -- this is a tough place for community to show up. You know, the press, the Government has not been kind to her. The press has not been kind to her. And -- but her community has shown up for her.

And that supports Pretrial Services' assessment that she can come -- that if released, she'll be in a position where she'll be supported, but also where Pretrial Services can support -- can monitor her.

I think the Government may have misspoken when it said that only one of the ten devices in the house would be monitored. I think what I believe pretrial services said, and I imagine they'll have a chance to speak for themselves, is that any device to which Ms. Bryant has access will be monitored.

So that would not necessarily include, for example, her roommate's phone, so, you know, devices that only they use. But it would include, for example, gaming consoles, anything to which Ms. Bryant has access. And so -- and I would note that, you know, this is not such a strange idea. The -- this is a very unusual case for this district or really any district. I

don't know that -- for the reasons I've expressed, I think conspiracy is a -- maybe a stretch here but the -- but we do release people for computer-related crimes all the time. For -- you know, whether that's -- that's fraud or, you know, theft, or, you know offenses involving pornography or threats or so forth. And pretrial services, you know, to incredibly small number of exceptions successfully supervises people. And here that -- their likelihood of success on supervision is particularly good because there's -- the Government is really quite unclear on what -- what crime she would commit. Van Rootselaar is gone.

The Government in their memorandum noted that pretrial services had -- was recommending detention. I think the Court knows that they recommended detention because they had not had an opportunity to investigate any of the -- any of Ms. Bryant's collateral contacts or her release address or her, you know, drug or alcohol use, her mental health, any of the 3142(g) factors that weigh upon release. They've now had that opportunity. They have now reviewed all of the 3142(g) factors and all of the -- and have concluded with the exception of the -- of the offense itself, which I think Pretrial Services does not focus on and which I think everybody agrees is the least important factor. And they've concluded that she can be released on appropriate conditions.

We've suggested some in our memorandum. The --

Pretrial Services have recommended some others, and they're -- we have no objection to any of those. This is a -- this is a horrible crime and there is -- there is a lot of really emotional rhetoric here. Not just -- not rhetoric, not insubstantial rhetoric, emotional things to say. But the standard here is the same.

And here, given Ms. Bryant's lack of criminal history, her ties to the community, the nature of the offense, the Government can't meet its burden to show that no condition or combination of conditions would reasonably protect the public. We'd urge the Court to order her release.

THE COURT: Thank you.

So I think it might be helpful if I could talk a little bit about what the purpose of the hearing is and kind of how I come to a decision about what the correct decision is. And it's a matter of judgment. I'm a judge. So that's my job, and it's -- might be useful to remember that the purpose of the hearing today is to determine whether the person charged, Ms. Bryant, should be detained pending further court proceedings or released in the community on different conditions of supervision, and pretrial services has suggested a few.

Another thing I might share is that everybody that's spoken has a different perspective on this, different roles, and the people that happen to have been the ones serving in those roles are probably among the best we've got in this

courthouse. The prosecutor has a certain perspective. The defense lawyer has a certain perspective, and these two attorneys are absolutely among the best that will ever appear in this courthouse and have done a great job and will continue to do that.

Pretrial Services, I'd like to brag, is amongst the best in the country. Their job is to look at the facts that they have presented to them, the nature -- particularly the nature and circumstances thereof but more in context of the particularities of the defendant and the ability to supervise the defendant.

A full-scale consideration of the facts and circumstances of the case and how that bears on the ability to craft conditions of supervision that might effectively address the risk of danger to the community and any risk of non-appearance that the defendant might pose, that's really a job for the judge.

And in this case, the issue is multifaceted. Are there conditions of release that could reasonably address any risk of danger to the defendant themself or the community as well as the risk of non-appearance. Lawyers have referred to this being a presumption case. It's kind of a shorthand.

We're saying that this is a case where specifically the nature of the offense is designated as one where there's a presumption but a rebuttable presumption that the defendant

does pose a risk of danger and a risk of non-appearance.

So what the judge is doing is determining can -- is there such a risk? There certainly is in this case a risk of both factors but are there conditions that could reasonably address those risks? So what the judge does is not just a matter of listening to the Government and listening to the defense lawyer and deciding who had the best argument. That's really not quite it.

It's also not simply taking into account the recommendations of pretrial services as for conditions because it's their job to do something that really is pretty difficult, which is to -- in a very preliminary setting, when just at the beginning of a case decide are there conditions that we could suggest that we would implement because they would be responsible for putting those conditions into effect that could reasonably address the risk of danger that an individual might present and any risk of non-appearance.

But they're not really evaluating part -- in any specific way some of the more intangibles or the -- especially the facts and circumstances of the offense. So that's a job for the judge.

So as I approach this particular case, it's really important to consider the nature, facts, and circumstances of the offense. There is case law that says that should be the least important factor. Yeah, but it's still a factor, and

they're all really important. If you had to rank them, maybe you'd say, well, not as much as some of the others. Nevertheless, in this case, I think it is significant.

I do want to say I really appreciate the statements filed by the witness -- the individuals who filed the written statements. I know that was difficult. I've read them and I appreciate that.

So this -- the offense that's charged here is one that appears to have been, you know, long planned, concerted, prolonged planning, horrific was the term used. Yes, for sure. And a lot of publicity, very much in the public eye. One that I'm sure everyone that considers it, learns about it, their response is why, why did that happen? We're going to know a lot about how, but why, that's more difficult.

But insofar as this defendant's determi -- or the Court's determination of the defendant's susceptibility to court supervision, it actually becomes more important. And Pretrial has identified serious mental health concerns that are deeply rooted, apparently in -- with regard to the defendant and some substance abuse, all of which compound the difficulty of crafting conditions.

Furthermore, this is a case involving use of the internet, and so any conditions would have to be very pointed and specific as to supervision of internet access. And it seems as though we're always one step behind the development of

the internet and we have some pretty good ways to supervise use. They're not a guarantee. They don't have to be. The conditions of su -- excuse me, conditions of supervision don't have to guarantee the safety of the community but the more consequential violation of the conditions becomes the more important the likelihood of success with the internet supervision becomes. And in this case that is very, very important to -- if defendant were released to have thorough monitoring of any access to the internet.

So how do the -- and those are really some of the most important factors here. And the conditions would certainly have to have perhaps mental health treatment monitoring, that type of thing.

I am evaluating the likelihood of success with the conditions that Pretrial Services has suggested, and what they've suggested are the most stringent that really we have to offer at this time. The fact that the alleged offense -- well, it's not alleged that it happened; obviously it did, but the perpetrator was a tragically vulnerable unstable individual. That's concerning in that -- in terms of the interaction between the defendant and that person.

I don't think this is a case where those conditions proposed by Pretrial Services could reasonably address the risk of danger to the community should the conditions of supervision not succeed or even the risk of non-appearance posed by the

concerns about the potential instability of the defendant.

So what that leads me to conclude is that, no, I don't see conditions of release that could reasonably address those risks. And so I will order that the defendant be detained until further court order. Thank you.

THE CLERK: All rise. Court is in recess.

(Proceedings concluded.)

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Kathleen M. Price ______________________ DATE: November 17, 2026

Kathleen Price, AAERT Cert. No. 325

Price Transcript Service