The Honorable Kymberly K. Evanson

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JAMES CODY BRYANT,<br>Defendant. | NO. CR26-196 KKE<br><br>UNITED STATES' RESPONSE TO MOTION FOR REVOCATION OF DETENTION ORDER |

**I. Introduction.**

Bryant is charged with Conspiracy to Murder Persons in a Foreign Country for involvement in a plot that resulted in a horrific school shooting in British Columbia, Canada. On February 10, 2026, Jesse Van Rootselaar traveled to the Tumbler Ridge Secondary School armed with multiple firearms and an explosive device. Van Rootselaar murdered three girls (age twelve), two boys (ages twelve and thirteen), and a staff member. At least two other children suffered gunshot wounds requiring serious medical treatment. Immediately prior, Van Rootselaar killed two family members (mother and stepbrother) at their nearby home.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Bryant conspired with Van Rootselaar to commit these murders. Over a six-month period, Bryant was in daily communication over Discord with Van Rootselaar. They discussed the details of the murder plot, including Van Rootselaar's desire to kill as many victims as possible and broadcast the killings over the internet. Bryant does not deny being party to these conversations, but claims not to have done anything to further the murder conspiracy. Among other things, Bryant claims to have believed Van Rootselaar's plot was a "fantasy" and that Bryant was never aware "violence was imminent."

But the evidence overwhelmingly shows that Bryant knew perfectly well Van Rootselaar planned to commit a mass atrocity, and that Bryant took multiple, concrete steps to further Van Rootselaar's plan, including agreeing to livestream the attack; providing money for Van Rootselaar to purchase items for use during the attack, including a lighter to detonate an explosive device Van Rootselaar deployed at the school; giving tactical advice regarding the carrying out of the attack; and agreeing not to report the attack plot to law enforcement.

Magistrate Judge Mary Alice Theiler presided over the detention hearing in this case. Dkt. 14. After hearing argument from the parties and reviewing written submissions, Judge Theiler entered a Detention Order, finding that "that no condition or combination of conditions which defendant can meet will reasonably assure the appearance of defendant as required and the safety of other persons and the community." Dkt. 15 at 1. Nothing has changed with respect to the Bail Reform Act factors that Judge Theiler considered. The facts and circumstances of this case still establish that Bryant poses a danger to the community and a risk of nonappearance if released. This Court should not revoke the Detention Order.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**II. The Legal Standards.**

A district court reviews a magistrate judge's detention order *de novo* under the Bail Reform Act. *United States v. Koening*, 912 F. 2d 1190, 1191 (9th Cir. 1990).

The Act allows pretrial detention of a defendant without bail if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate if a defendant is a danger to the community *or* a flight risk; both need not apply. *United States v. Motamedi*, 767 F.2d 1403, 1405–06 (9th Cir. 1985).

The Act provides a rebuttable presumption for detention in cases like the instant one, where Bryant is charged with an offense under 18 U.S.C. § 956(a). *See* 18 U.S.C. § 3142(e)(3)(B). Therefore, the Court starts with the presumption "that no condition or combination of conditions will reasonably assure the appearance of [Bryant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). "Although the presumption shifts a burden of production to the defendant, the burden of persuasion remains with the government." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).

If a defendant proffers evidence sufficient to rebut the presumption of detention, four factors guide the detention analysis: "(1) the nature and circumstances of the offense charged …; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including [] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g); *Motamedi*, 767 F.2d at 1407. Establishing flight risk requires a preponderance of the evidence; proving dangerousness requires clear and convincing evidence. 18 U.S.C. § 3142(f); *Id*.

The government may present evidence regarding the detention factors by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*United States v. Salerno*, 481 U.S. 739, 742-743 (1987); *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986).

Even if Bryant could meet the burden of production to rebut the statutory presumption, "the presumption is not erased" but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Hir*, 517 F.3d at 1086 (citation omitted). The presumption is not simply an evidentiary tool; instead, "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (citation omitted).

## III. A Review of the Detention Factors Supports the Detention Order.

In addition to the statutory presumption for detention in this case, each of the statutory factors listed in § 3142(g) weighs in favor of pretrial detention. There is no combination of conditions that will reasonably ensure Bryant's presence at future court proceedings or the safety of the community. Judge Theiler properly entered the Detention Order, and this Court should maintain it.

### A. The Nature and Circumstances of Bryant's Offense.

The 41-page Complaint details the horrific nature of Bryant's offense. It does not get much more serious or dangerous for the community. Byrant aided in Van Rootselaar's murder plot, becoming a conspirator in an attack that resulted in the deaths of five school-age children, among others. Bryant played an important role in the conspiracy that led to these heartbreaking murders by aiding Van Rootselaar in various essential ways.

#### 1. Bryant's Agreement to Assist in the Livestream of the Attack.

Bryant agreed to record Van Rootselaar's livestream of the murders and broadcast it over the internet for the public to view. Van Rootselaar repeatedly emphasized that broadcasting the livestream was an essential aspect of the conspiracy. Complaint at 21-28. For example, on January 21, 2026, Van Rootselaar told Bryant: "If you don't post it it won't work. … If I don't livestream it people can be detached from the gravity of how I



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

feel. It's just another headline. I need people to see it and personally witness the lives be impacted." *Id.* at 27. Bryant assured Van Rootselaar: "I won't fail you." *Id.*

Similarly, on February 9, 2026, the day before the attack, Van Rootselaar stated: "If I don't have someone I know for certain is gonna be there [to livestream] I don't wanna do it." Complaint at 28. Bryant replied: "I literally fixed my sleep schedule to help me stay up to be there after work." *Id.* Later that day, Van Rootselaar again emphasized the importance of the livestream: "I really do beg that u at least give a sincere try at being there for my final moments n manage to share them. I bought the whole camera holder thing n everything. I don't wanna be let down." *Id.* at 28. Bryant assured Van Rootselaar: "I will I'll be there." On other occasions, Bryant promised to leave work or wake up at any time to accept the livestream. *See, e.g. Id.* at 22-23.

Bryant also assisted Van Rootselaar in testing the livestream equipment on multiple occasions to ensure the transmission would be strong and the camera would provide a viewing angle of the murders. Complaint at 21-22, 26. On these occasions, Bryant assured Van Rootselaar the transmission was coming through, it "looks solid," and "it works." *Id.*

After assisting with the test livestreams, Bryant made good on the promise to broadcast the livestream of the murders. Moments before the school attack, after Van Rootselaar killed family members and was sitting in a vehicle ready to drive to the school, Bryant and Van Rootselaar conferred about the livestream feed. Van Rootselaar started the feed, and Bryant confirmed it was coming through. Complaint at 39. Bryant was the only person who viewed the livestream. *Id.* at 5. After about 20 seconds, the feed was cut off due to technical issues. *Id.* at 39. But the livestream's failure was despite Bryant's best efforts to make it happen.

Bryant's motion attempts to minimize the importance of the livestream to Van Rootselaar's murder plan. S*ee* Dkt. 28 at 19-20 (claiming that although Bryant agreed to disseminate the livestream, Bryant "did not want to do so" and Van Rootselaar would have committed the murders regardless). But Van Rooselaar's words paint a different



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

picture – insisting that an essential part of the plot was for the murders be livestreamed, recorded, and broadcast over the internet for the world to view.

**2. Bryant's Provision of Monetary Support for the Attack.**

Bryant provided money to Van Rootselaar to purchase items for use during the attack, including the shoes that would be worn during the shooting, a lighter that would be used to ignite an explosive device, and stickers to decorate the firearms that would be used to commit the murders. Complaint 12-21.

Bryant's agreement to send money for the lighter is most concerning. The communications about the explosive device took place on January 22-25, 2026. Complaint at 18-21. During these conversations, Van Rootselaar sent Bryant photographs of the explosive device Van Rootselaar had constructed; explained the components of the device – including that a lighter would be used as the source of ignition and that it contained shotgun shells and flammable chemicals; and detailed and how the device would be deployed during the attack. *Id*. Van Rootselaar ultimately asked Bryant for money to purchase the lighter. *Id.* at 19. Bryant agreed and sent $14.33 to Van Rootselaar via PayPal. *Id.* The transaction was reversed because, unbeknownst to them, Van Rootselaar's PayPal account had been deactivated. *Id.* They then discussed alternative ways for Bryant to get Van Rootselaar the funds. *Id.* at 19-20.

Bryant's motion claims that the Complaint misleadingly portrays these messages to "make it appear that" Bryant was purchasing the lighter for Van Rootselaar's device. Motion at 22. Specifically, Bryant points out that two days passed between a message Van Rootselaar sent about planning to attach a lighter to the device (Complaint at 19, lines 9-11) and when Van Rootselaar asked Bryant for money to purchase the lighter (Complaint at 19, line 12). Bryant is correct about the two-day gap; the Complaint should have been more precise in that regard.[1] But this did not cause any distortion of the

---

[1] The Complaint did make clear it was summarizing a series of messages that occurred over the course of a multi-day period, but did not precisely specify which messages occurred on which days. Complaint at 18 ("On or about January 22-25, 2026, . . .").



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

evidence. In fact, taking a closer look at the communications over the entire period makes it even clearer that Bryant understood the lighter would be used in the explosive device.

The conversation about the device started on January 22, 2026, at about 11:00 p.m., with Van Rootselaar sending a series of messages, including: "Sadly the original lid to my Molotov broke also on top of how the tape did earlier. I fixed it up tho. But I made a new lid via this stretchy pink thing and some sealant lol." Complaint at 18.[2] Van Rootselaar included a photograph of the device being assembled – notably lacking a lighter at the time:



Van Rootselaar explained that there were matches affixed to the device to assist in the ignition: "I ripped off some other match striking surfaces from the side of these matchstick packages I have and they'll do. Added some other matches too. White cardboard ones that are easier/quicker to catch fire."

---

[2] The government cites to the Complaint when messages were included therein. Where no citation is provided, the messages were not contained in the Complaint and are being offered by way of an evidentiary proffer. *See Salerno,* 481 U.S. at 742-743 (Bail Reform Act permits parties to make evidentiary proffer at detention hearing); *Winsor*, 785 F.2d at 756 ("[T]he government may proceed in a detention hearing by proffer or hearsay.").



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Over the next 40 minutes, Bryant and Van Rootselaar exchanged the following messages (among others) about the explosive device:

> **Van Rootselaar:** It's crazy how many flammable things are in this. Even explosive. I dumped two shotgun shells in dis, I also put 2 full entire .22lr rounds cuz why not lol, and also the crude kcio3 and sugar rocket mixture stuf can also push the material out and spread it. I bet this can make a whole room go up super quickly.
>
> **Bryant:** sounds dangerous
>
> **Van Rootselaar:** that's kinda the point ya
>
> **Van Rootselaar:** The fire should make the situation more complex for first responders, the smoke can make it harder to tell if a person they see is a threat or if they are simply someone trying to escape or run away. Which would make them encroaching on me slower due to them having to be careful to identify who is a threat through the haze of putrid black smoke. Lol I should've put glitter in it before I sealed it glitter is annoying and cute.
>
> **Bryant:** Lol. Molten glitter
>
> **Van Rootselaar:** I put that blue rubber band on the bottle so when its time for me to leave I can take whatever lighter I've been using at the time to light my weed and I can pin it between the rubber band and the bottle to bring with me and have readily accessible to use for the bottle.

Complaint at 18-19.

Van Rootselaar emphasized the utility of using a lighter (as opposed to the matches) as the ignition source: "Because whilst I put match strips there as a last resort in case something went wrong and it was all I had but having a lighter to use is still ideal over matches since I don't live in the 1930s." Van Rootselaar then concluded: "Smart to have the lighter accessible as quickly as possible so I can get back to shooting." Complaint at 19.

The two-day gap noted by Bryant starts at this point. For the next seven hours, there were no messages because Bryant and Van Rootselaar were sleeping. The conversation resumed the next morning, January 23, 2026, and quickly returned to the explosive device. Van Rootselaar told Bryant that the "bottle" (device) fits in the pouch



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Van Rootselaar planned to wear during the attack. Bryant responded: “Nice.” The conversation continued:

> **Van Rootselaar:** I think I’m relatively well equipped. And I don’t think im over equipped either.
>
> **Bryant:** Yeah, you’re pretty set up.
>
> **Van Rootselaar:** I live in a small shitty town so I don’t rlly need all that much but I have a lot
>
> **Bryant:** [affirmative response]
>
> **Van Rooselaar:** luv u
>
> **Bryant:** love u too[3]

Later that afternoon, over the course of 30 minutes, Van Rootselaar and Bryant continued to discuss Van Rootselaar’s plan to deploy the device during the attack:

> **Van Rootselaar:** w that little bottle I created and in its pouch I’d better friggin use it lmao. If the police shoot me up and kill me the bottle will probably shatter, and their bullets won’t kill me instantly. Acetone really burns on wounds. So if I don’t use it that’ll probably happen to me which is quite painful and doesn’t help my whole dying situation. Still want to get that bottle away from me before I am confronted. Better to toss it and not use it than not use it and be harmed by my own thingy.
>
> **Bryant:** Probably best to toss yeah
>
> **Van Rootselaar:** Just need to quickly find something flammable that looks like it’d catch well and use that bottle, I shouldn’t be too picky with what I throw it at. I am very opposed to chemical burns deep in my flesh. But I also don’t wanna just throw it at any old thing because then it likely won’t start a larger fire. … The other possibility which would be more cruel and less effective in actually starting a fire would be to just toss it at someone who is already injured too much to fight back. Like, bullets can often paralyze people. If someone is paralyzed there is nothing they can do about it to stop me.

[3] Throughout the communications, Bryant and Van Rootselaar repeatedly expressed their love for each other.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

During the evening of January 23, 2026, and continuing through the following day, Bryant and Van Rootselaar had sporadic contact about unrelated topics.

On the morning of January 25, 2026, Van Rootselaar sent a series of messages questioning why anyone would attempt to talk Van Rootselaar out of the attack, including: "Nah honestly they got a better chance punching me in the face or smashing me over the head with a fire extinguisher or something lol. It's silly that some might think an appeal to humanity would work on me. I am pretty far gone. Very disgruntled by the whole world." Bryant replied, "Vali[d]."

There was then a 90-minute period with no messages until Van Rootselaar reinitiated contact by asking Bryant for money to purchase the lighter:

> **Van Rootselaar:** Mel do u have $ to spare I need a lighter
>
> **Van Rootselaar:** and maybe like a monster[4] cuz my sleep schedule is backwards n im trying to stay up

Complaint at 19. Bryant immediately sent $14.33 to Van Rootselaar via PayPal. *Id.* The transaction was reversed by PayPal, and they discussed alternative ways for Bryant to get Van Rootselaar the funds. *Id.* at 19-20.

A few hours later, following some unrelated messages, Van Rootselaar sent Bryant another photograph of the explosive device – this time with a sample lighter in place – and they had the following exchange:

[4] "Monster" presumably refers to an energy drink.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970




> **Van Rootselaar:** I put one lighter on the side of that bottle I made just now cuz someone gave me a new lighter cuz I was complaining about not having enough. So im gonna put this old lighter here. whenever I do my plan I'll probably put another lighter under the rubber band, whatever lighter I've been using to smoke and know for sure works well. Then I'll have 2 lighters and at least one of them is surely guaranteed to work. This one has fuel in it, it's just finicky so I want another and if somehowwww both lighters don't work there is the match strips.
>
> **Bryant:** [affirmative response] backupss

Complaint at 20-21.

The conversation about the explosive device concluded a few minutes later with this additional exchange:

> **Van Rootselaar:** I enjoy yapping about this bottle [device] cuz I am SUCH a pyro. I can't wait to see what it does, I wanna see the sticky polystyrenes sparkle on whatever I throw it at from the additives inside like gunpowder burning off in the napalm. Normal napalm doesn't have things like this in it, so I think it may look unique. I wanna see the thick black smoke bailing off from the flame.
>
> **Bryant:** i'm curious what it does too honestly



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

This more detailed review of the conversations about the explosive device leaves no doubt that Bryant understood exactly what the lighter would be used for. Although Bryant now attempts to muddle the issue by citing earlier conversations about Van Rootselaar losing and finding other lighters for smoking (Motion at 23), the evidence makes clear that on January 25, 2026, the lighter Bryant sent money for would be used to detonate a bomb during Van Rootselaar's attack. Indeed, Bryant was "curious what" the device would do.

Van Rootselaar ultimately deployed this explosive device during the attack at the Tumbler Ridge school, using it in the exact manner as had been described to Bryant. Complaint at 4, 21. Although $14.33 may not be a lot of money, it speaks volumes about the seriousness of the offense and the defendant's character that Bryant was willing to help purchase the ignition source for an explosive device that was to be used to commit a mass casualty attack.

**3. Conversations About Planning and Preparing for the Attack.**

Bryant and Van Rootselaar had numerous conversations about Van Rootselaar's planning and preparation for the murders, including discussing potential attack locations, the way the attack would unfold, and related topics. Van Rootselaar often described vivid details of the attack plan. *See, e.g.* Complaint at 10 ("I think it'd be pretty hard to escape me with extended magazines on my vector, the recoil is just so light that I really don't think I'd miss. And the suppressive fire would make it hard to run so I think more people would end up hiding. I want people to hide because that means I can play hide and seek.").

During some of these conversations, Bryant gave Van Rootselaar tactical advice regarding the carrying out of the attack, including that: "wide open spaces" are conducive to more casualties; Van Rootselaar should be armed with a handgun, among other weapons; and Van Rootselaar should make a functional suicide vest instead of a fake vest. Complaint at 8-12.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Bryant's motion seeks to minimize the importance of these conversations by making the bogus claim that Bryant perceived Van Rootselaar's plan to be "clearly a fantasy" for parts of the six-month period during which they communicated. Motion at 5-6. For example, Bryant says the plan seemed like a fantasy because Van Rootselaar did "not have access to guns" until later in the period. Motion at 5-6. But the conversations cited in Bryant's own motion show this is not true. One of the earliest known communications[5] between Bryant and Van Rootselaar, on August 4, 2025, is quoted in the motion, during which Van Rootselaar talks about needing to be "careful with the trigger" of a loaded firearm and discusses the weight of the trigger pull, with Bryant warning, "Don't leave it loaded like that." Motion at 12. It was clear to Bryant from the outset that Van Rootselaar had firearms, ammunition, and the other means to commit the attack. Bryant knew this was no fantasy.

Bryant's claim that Van Rootselaar's plan was perceived as a "fantasy" is further undercut by a conversation just two weeks later, on August 20, 2025. Van Rootselaar asked Bryant to purchase a 3D printed firearm kit for Van Rootselaar. Bryant initially responded, "I'm not risking mailing that shit," but then added, "Can you sneak that over the border I wonder. . . I'll have to see the parts. I could manage it I think." Complaint at 14. Later that same day, Bryant sent a Discord message to another person (not Van Rootselaar) making clear that Bryant was *independently researching* 3D printed firearm kits over the internet: "Lookinh at 3d printed gun kits rn [right now]. ... Theyre cheap thoo." *Id.* at 15. Bryant did not treat this as a fantasy.

**4. Bryant's Statements of Disapproval of the Attack Plot.**

Bryant's motion accuses the government of misleading Magistrate Judge Theiler by not revealing the existence of conversations during which Bryant expressed disapproval of the attack plot or encouraged Van Rootselaar to consider delaying and/or not committing the attack. Motion at 23 (claiming that the "government did not mention" Bryant's "efforts to dissuade Van Rootselaar . . ."). This claim is completely baseless.

[5] The Discord communications returned on the government's search warrant begin on August 1, 2025.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government has acknowledged these conversations from the outset. The Complaint includes an entire section entitled, "Bryant's Statements of Disapproval and Attempts to Convince Van Rootselaar to Delay or not Commit the Attack." Complaint at 31. That section begins with: "During several conversations, Bryant expressed disapproval of the attack plot, in particular as it related to targeting a school for the attack. Bryant also occasionally encouraged Van Rootselaar to consider delaying and/or not committing the attack. Some examples are set forth below." *Id*. The Complaint then spends seven of its 41 pages quoting excerpts from several of these conversations.[6] *Id.* at 31-38.

Moreover, the government discussed these same conversations in its Memorandum in Support of Detention Order. Dkt. 10 at 7 (recognizing there were "times when Bryant expressed disapproval of Van Rootselaar's attack plot, in particular as it related to targeting a school, and occasionally encouraged Van Rootselaar to consider delaying and/or not committing the attack") (citing Complaint at 31-38).

This evidence clearly was known to Judge Theiler at the time she entered the Detention Order. The few additional examples cited in Bryant's motion do nothing to change the overall picture.

**5. Bryant Advanced the Conspiracy in the Final Moments.**

Nor do these conversations get Bryant off the hook from being a conspirator in the murders. Although Bryant may have equivocated and at times hoped Van Rootselaar would not move forward with the killings, when the final moments came on February 10, 2026, Bryant chose to advance the conspiracy by accepting the livestream and helping Van Rootselaar start the car to drive to the Tumbler Ridge school.

Bryant's motion makes the preposterous claim that Bryant never understood "violence was imminent" because Van Rootselaar had previously delayed the murders. Motion at 29. But Bryant knew full well that "violence was imminent" on February 10,

---

[6] Many of the conversations discussed in Bryant's motion were already included in the Complaint. *Compare* Motion at 15-18 with Complaint at 34-38.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2026. As the murders were unfolding, Bryant was in direct communication with Van Rootselaar, who was sitting in a vehicle having just killed family members and about to drive to the Tumbler Ridge school to carry out more murders. Van Rootselaar specifically told Bryant: "I'm going now. . . I shot them [mother and stepbrother]. Fuck." Complaint at 39. At the same time, the livestream Bryant was viewing showed Van Rootselaar sitting in the vehicle with firearms. *Id.* at 4.

Bryant knew exactly what was going on and admitted as much two days later during a recorded interview with HSI agents. Bryant acknowledged that Van Rootselaar "messaged me that she already killed them [family members]." Agents asked whether Bryant felt that Van Rootselaar "was going to go and maybe hurt somebody." Bryant answered, "Yeah." Bryant then described watching the livestream and seeing Van Rootselaar sitting in the driver's seat of the car with guns. Bryant told the agents that Van Rootselaaar was "[s]truggling with the car, she didn't know how to drive. She was trying to get it started."

And what did Bryant do at that moment? Bryant helped Van Rootselaar figure out how to start the car. Van Rootselaar asked for help: "I can't figure out how to start the car help." Complaint at 39. Bryant initially advised, "Turn the key til it sounds like its going enough then stop." *Id.* at 40. After Van Rootselaar explained the vehicle had a "push to start" ignition, Bryant counseled, "Button? Hold it a lil maybe." *Id.* Van Rootselaar then successfully started the car and proceeded to drive to the Tumbler Ridge school to murder children. *Id.* at 39-40. During this entire conversation, Bryant knew full well that "violence was imminent" and chose to further it.

**B. The Weight of the Evidence Against Bryant.**

The evidence against Bryant is extremely strong. It consists primarily of Bryant's own words during the Discord conversations with Van Rootselaar, as summarized in the Complaint and herein. Bryant confirmed much of this same information during interviews with federal law enforcement agents. Complaint at 5-7.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C. Bryant's History and Characteristics.**

Although various aspects of Bryant's history and characteristics cut both ways on the detention analysis, on balance this factor weighs in favor of maintaining the Detention Order. In Bryant's favor are modest ties to the Western District of Washington and the lack of any criminal history. Bryant also was employed at a fast-food restaurant, although it's not clear whether that job remains available due to the arrest in this case. The defendant previously told federal agents that the job was on "thin ice" due to calling in sick often, and Bryant told the Probation Office that it was uncertain the job was still available after the arrest. First Supplemental Pretrial Services Report at 3.

But these factors are outweighed by other aspects of Bryant's history and characteristics, which call for pretrial detention. Magistrate Judge Theiler and the Probation Office concluded that Bryant presents with mental health and substance abuse concerns. Detention Order at 2; First Supplemental Pretrial Services Report at 3. Of particular concern is that Bryant appears to have minimized the presence of suicidal ideations. Specifically, Bryant denied having any such thoughts "in the past couple of years." First Supplemental Pretrial Services Report at 3. But that is inconsistent with some of Bryant's statements to Van Rootselaar. For example, on August 27, 2025, Bryant stated: "I've just been constantly at the point where if juuust the right thing goes wrong I'll kill myself. For years. It's so exhausting." On January 12, 2026, Bryant stated: "Yeah, suicide is kinda easy if you really wanna die."

More importantly, the offense conduct in this case reveals deeply rooted aspects of Bryant's character that make it impossible for the Court to ensure the safety of the community if the Court were to order release. Bryant participated in the planning of a mass murder over the course of several months. Up until the last moment, Bryant could have changed course and put a stop to this horrific crime. But Bryant chose not to intercede. Instead, Bryant moved forward with the agreement to assist Van Rootselaar in committing the murders.

Bryant repeatedly acknowledged being in a unique position to stop Van Rootselaar. For example, Bryant stated: "I know I can like, save lives I guess but idk.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

…trolly problem. I'd rather you not get snitched on." Complaint at 28. Similarly, Bryant told Van Rootselaar: "I might be the only one who can [stop you] at this point lol." *Id.* at 29. Bryant even promised not to report Van Rootselaar if the murder plan involved an act of "terrorism." *Id.* All the way to the end, Bryant assured Van Rootselaar: "I still won't snitch." *Id.*

Bryant's motion tries to excuse this catastrophic failure to warn law enforcement about the murder plot by offering several unconvincing justifications. Among other things, Bryant claims to have believed that "reporting Van Rootselaar might trigger a massacre" of family members or responding police officers, and that referring Van Rootselaar "for psychiatric help would be counterproductive." Motion at 11, 29. But the reality is this: Bryant placed a higher value on loyalty to, and affection for, Van Rootselaar then on saving the lives of innocent children. A defendant whose character allows them to help plan a mass shooting, and then sits back and (literally) tries to watch as schoolchildren are murdered instead of "snitching" on the killer, is a danger to the community and should be detained pending trial.

The Court should have additional concerns about Bryant's character based on a conversation that took place on January 25, 2026, during which Bryant discussed the desire to engage in violence, specifically a stabbing. Bryant and Van Rootselaar had the following exchange during which they referenced a prior occasion when Bryant "stabbed someone" and Bryant's desire to do it again:

> **Van Rootselaar:** Though you did mention having dreams about stabbing people, and being interested in that. I get the interest, it's super satisfying. I'd love to do that over and over again. I like poking inanimate things like bottles of water or cardboard or other stuff it's satisfying but it'd be peak to be able to do it into a real struggling target.
>
> **Bryant:** Hard to tell with me. Idk what I'd do if given the chance.
>
> **Van Rootselaar:** Valid
>
> **Bryant:** Kinda why I'm into getting a gun for self defense. I feel less likely to enjoy using it. Loud, disconnected.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Van Rootselaar:** Idk shooting is pretty fun

**Bryant:** Yeah but less fun than digging a knife into flesh imo

**Van Rootselaar:** What do you even know about what people look like when they're all stabbed up? I mean it isn't quite clean. Or what they smell like, or sound like? Sure you've stabbed someone but it wasn't that serious. Personally I just don't wanna be up in someone's grill when their stomach pops or lung deflates and I smell their gross biology. ig I watch a lot of that stuff so im very grounded in the grotesqueness of it.

**Bryant:** I just feel like there's something to enjoy about how direct you are in their maiming. Warm blood getting on your hands. Any movement being agony.

**Van Rootselaar:** Also I've seen so many people vomit immediately when they're stabbed it's common. Gargle up nasty shit.

**Bryant:** If I puke that probably looks better on my behalf

**Van Rootselaar:** Trueeeee good legal defense

**Bryant:** Plus Its not like I really wanna do it that badly. Just liiike, if i gotta

**Van Rootselaar:** Yeah but shooting is just more satisfying imo lol

**Bryant:** I'm not counting that one time lol

### D. Seriousness of the Danger to the Community Posed by Bryant's Release.

For all of the above reasons, Bryant's pre-trial release would pose a serious danger to the community. Moreover, one specific aspect of Bryant's offense conduct makes release particularly dangerous: Bryant's participation in the charged murder conspiracy took place primarily through online communications. As such, Bryant's future online behavior should be a primary concern for the Court. *See* Detention Order at 2 (noting "concerns with internet use and access due to the nature of the offense").

Although the Probation Office suggested a condition of release requiring computer/digital device monitoring, that is not practical to enforce here. There are numerous digital devices at the residence Bryant shares with two roommates – at least



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

five computers, a smart TV, four online gaming devices, and several other gaming consoles. First Supplemental Pretrial Services Report at 2. However, the Probation Office would only monitor the devices belonging to Bryant. This would leave the defendant with easy access to several unmonitored digital devices, failing to ensure that Bryant does not pose a continuing threat to the community through online behavior. Considering the seriousness of the offense conduct in this case, releasing Bryant under these circumstances is too big of a risk to take with the safety of the community.

## IV. Conclusion.

For all the reasons set forth above, the Court should maintain the Detention Order.

DATED this 25th day of October, 2026.

Respectfully submitted,

*s/ Todd Greenberg*
TODD GREENBERG
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-2636
Fax: 206-553-4440
Email: Todd.Greenberg4@usdoj.gov

I certify that this pleading contains 5,878 words, in compliance with the Local Criminal Rules.